2006-NMCA-081

139 P.3d 201

**LOS ALAMOS NATIONAL BANK, Plaintiff–Appellant,**

v.

**MARTINEZ SURVEYING SERVICES, LLC and Danny S. Martinez, Defendants–Appellees,**

First National Bank of Santa Fe, Precision Surveys, Inc., United States of America, Internal Revenue Service, and The New Mexico Taxation & Revenue Department, Defendants.

**No. 25,425.**

Court of Appeals of New Mexico.

June 5, 2006.

Jane B. Yohalem, Jurgens & With, P.A., James R. Jurgens, Santa Fe, NM, for Appellant.

Clifford C. Gramer, Jr., Santa Fe, NM, for Appellees.

## OPINION

VIGIL, Judge.

{1} Los Alamos National Bank (LANB) sued Defendants Danny Martinez (Martinez) and Martinez Surveying Services, LLC (MSS) for debt and money due on an ABC Loan, a promissory Note, and to foreclose a security interest on personalty. Defendants denied they were indebted to LANB and asserted in a counterclaim that LANB and Title Guaranty conspired to interfere with prospective contractual relations. Following

a bench trial, the district court filed findings of fact and conclusions of law and its judgment. The district court awarded judgment in favor of LANB on its complaint. The district court also awarded judgment in favor of Defendants on their counterclaim and further ordered that each party bear its own costs and attorney's fees. LANB appeals, arguing that neither the evidence nor the findings of the district court support a legal conclusion that LANB engaged in a conspiracy to interfere with prospective contractual relations and further, that it is entitled to be awarded its costs and attorney's fees. We agree. We therefore reverse and remand with instructions to enter judgment in favor of LANB on the counterclaim and to determine an appropriate award of interest, attorney's fees, and costs in favor of LANB. In all other respects the judgment is affirmed.

## FACTS

{2} In July 1997, LANB agreed to provide financing to Martinez to purchase a surveying business in Los Alamos, and Martinez d/b/a Martinez Surveying Services executed an ABC loan agreement with LANB with a credit limit of $50,000 (ABC Loan). In August 1999, Martinez d/b/a Martinez Surveying Services borrowed an additional $36,741.56 from LANB by executing a promissory note (Note). To secure the Note, Martinez executed a Security Agreement to LANB whereby he granted LANB a security interest in all furniture, equipment, inventory, accounts, etc., of Martinez Surveying Services, and in the proceeds thereof (the Collateral). Under the Security Agreement, Martinez agreed that he would not sell, transfer, lease or otherwise dispose of the Collateral without the prior written consent of LANB.

{3} Martinez Surveying Services was the only surveying business in Los Alamos in 1997, and Title Guaranty regularly ordered surveys for its customers from Martinez Surveying Services from 1997 until May 2001, and then its successor MSS from May 2001 until September 2001. The relationship between MSS and Title Guaranty was an ongoing, voluntary relationship. The district court found, "Title Guaranty never had a contract with MSS to order surveys from MSS." For two or three years prior to August 2001, when the alleged interference occurred, there were billing and payment errors between MSS and Title Guaranty. There was a dispute in the record as to whether these errors were due exclusively to MSS's billing practices or were partially attributable to Title Guaranty's accounting practices, but there was no dispute about the existence of these problems. Denise Terrazas, Title Guaranty's vice president, testified that MSS's accounting practices were "a nightmare." Martinez admitted that MSS and Title Guaranty had some billing problems and asserted that some of the problems were caused by Title Guaranty. While the billing errors, particularly double billings, were ultimately corrected, correcting them took Title Guaranty months of staff time and money.

{4} Martinez's wife worked for LANB for more than twelve years as a vice president of the bank until April 2000. In 1995, she was promoted to head LANB's mortgage-loan department. Over the years, Martinez and his wife had borrowed money from LANB to fund other business ventures. On October 17, 1997, the Martinezes entered into a development loan agreement with LANB to allow them to borrow $274,367 from LANB (Martinez Note). On September 11, 1998, DKDJ Holdings, LLC, a development company for which Mrs. Martinez was the managing member, entered into a Construction Loan Agreement to allow DKDJ to borrow $300,000 in additional funds from LANB (DKDJ Note). This loan agreement was guaranteed by both Mr. and Mrs. Martinez. In March 2000, just before Mrs. Martinez left her employment with LANB, DKDJ defaulted on the DKDJ Note. Approximately $86,000 was still owed to LANB at the time of default. The Martinez Note was in default in November 2000, with approximately $81,000 still owed. LANB filed suit against DKDJ and the Martinezes in 2000, seeking to collect on the amounts owed on these obligations.

{5} On May 23, 2001, Mr. and Mrs. Martinez filed for voluntary bankruptcy. In anticipation of the bankruptcy filing, Mr. and Mrs. Martinez formed MSS, on May 21, 2001,

a limited liability company, owned by a family partnership. Mr. and Mrs. Martinez each owned 24.5% of MSS, for a total of 49%, and the other 51% was owned by Martinez's father, who continued as the only licensed surveyor employed by MSS. When MSS was formed, Martinez assigned all of the liabilities and assets of Martinez Surveying Services, including the Collateral, to MSS. The district court found that even though Martinez was aware both of LANB's lien on the Collateral and of the Security Agreement's requirement that he advise LANB of any proposed transfer of the Collateral and obtain LANB's prior written consent, he did not contact LANB and made the assignment without LANB' s knowledge or consent. Martinez conceded that "it was partially correct" that part of the protection he sought was to keep LANB from being able to exercise its lien rights. LANB subsequently provided MSS with notice of its refusal to consent to MSS's use of the Collateral in March 2002.

{6} Beginning in 1995 and continuing until April 2000, when she left her employment at LANB, Mrs. Martinez engaged in an ongoing scheme of embezzlement involving fraudulent loans. In 1995, she made a fraudulent loan to her brother, deposited the money into an account she controlled, and spent the money. She also subsequently made other loans to a fictitious person and deposited this money into accounts at different banks. A portion of the monies embezzled from LANB were deposited into bank accounts owned and controlled jointly by Mr. and Mrs. Martinez. Trial exhibits show that $128,000 was deposited into one joint account and $23,000 into another, in addition to a number of smaller deposits. The plea agreement between federal prosecutors and Mrs. Martinez includes stipulations acknowledging guilt to charges of bank fraud and money laundering in the amount of $349,868.00. Some of the embezzled funds were used to repay LANB on the various notes and loans on which money was owed to LANB by Mr. and Mrs. Martinez and MSS.

{7} Title Guaranty's Board of Directors met in August 2001, and decided that Title Guaranty would no longer initiate new survey orders with MSS. The Board decided to complete all existing contracts with MSS and to honor requests to use MSS made by realtors or customers. However, it would not recommend MSS to its customers or contract for surveys with MSS on its own initiative. This decision forms the basis for the claim that LANB conspired with Title Guaranty to interfere with prospective contractual relations of Martinez and MSS.

{8} Trinity Capital Corporation, a bank holding company located in Los Alamos, New Mexico, owns all of the stock of LANB, a national bank. In May 2000, Trinity Capital acquired Title Guaranty. The two corporations are wholly owned subsidiaries of Trinity Capital. All three members of Title Guaranty's Board are also members of LANB's Board. In August and September 2001, Mr. Enloe served as the chief executive officer of LANB, as the president and chief executive officer of Title Guaranty, and as the chief executive officer of Trinity Capital. Ms. Terrazas was the vice president of Title Guaranty. The district court's findings note that the decision "was not made by LANB but by individuals associated with both LANB and Title Guaranty." Nevertheless, "[t]he decision to have Title Guaranty stop ordering surveys from [MSS] was made by Enloe, Wells and Kinsfather [sic], who were Directors of Title Guaranty, and Officers and Directors of LANB." The district court found, "LANB, by implication and through common directorship, caused Title Guaranty to stop ordering new surveys from MSS." Further, the district court concluded that "LANB used the positions of Enloe, Wells and Kinsfather [sic] with Title Guaranty, and Enloe's position as . . . boss of Denise Terrazas to cause or coerce Title Guaranty to stop ordering the surveys from MSS."

{9} Ms. Terrazas confirmed that in August 2001, she met with Mr. Enloe in his capacity as chief executive officer of Title Guaranty. At the meeting, Ms. Terrazas said she was instructed by Mr. Enloe to stop initiating survey orders from MSS, but if there were realtors, clients, or customers that wanted to use MSS, Title Guaranty could contract with MSS, and "[t]hat's what we did." The court found that Title Guaranty was still ordering

surveys from MSS in 2002. The dispute below centered on whether there was any improper coercion of Ms. Terrazas. Ms. Terrazas testified that, at that time, Mr. and Mrs. Martinez were her "best friends," that "[e]motions were high," and that her position as vice president of Title Guaranty was awkward, given their friendship. Ms. Terrazas testified that she was reluctant to tell the Martinezes that Title Guaranty would no longer initiate contracts with MSS, but she did so because she had been told to implement the Board's decision by Title Guaranty's President and her superior, Mr. Enloe. However, Ms. Terrazas denied that Mr. Enloe, or any other member of Title Guaranty's Board, threatened or forced her to implement the decision.

{10} Mr. Enloe testified why the Title Guaranty Board made its decision to stop ordering new surveys from MSS. The biggest concern identified was the dishonesty of the owners of MSS, given the embezzlement from LANB by Mrs. Martinez, a part owner of MSS, the deposit of embezzled money into joint accounts upon which checks were written by Martinez, and the transfer of assets by Martinez in anticipation of his bankruptcy filing two days later. Mr. Enloe testified, "the honesty issue is a big one, and, you know, if we can't have confidence and an understanding that the people we're doing business with are doing it in an honest manner, we can't and shouldn't do business with them. And that would have nothing to do with [LANB]." Mr. Enloe stated that it was his view, and the view of the other members of Title Guaranty's Board, that it was financially risky for Title Guaranty to continue to recommend to its customers a company whose owners had shown themselves to be dishonest and unethical. He testified that he had a fiduciary duty to protect Title Guaranty's profits and its shareholders, to ensure Title Guaranty operated legally, to protect its assets, and to act in Title Guaranty's best interests. Based on these interests, he saw little choice for Title Guaranty but to stop initiating new survey orders with MSS, and to stop recommending MSS to its customers. Mr. Enloe stated that he and the Board also relied, in part, on the accounting problems and double billing problems Title Guaranty had encountered with Martinez Surveying and MSS. He explained that it was expensive for both the bookkeeping in Title Guaranty and its auditors to continually search the records to determine if the billings were correct. He noted double billings, billings for work that Title Guaranty was never paid for, and billings for closings which didn't occur as concerns of the Board. The double billing of Title Guaranty by MSS raised additional questions about the honesty of Martinez and of MSS. Finally, the Board's decision was based, in part, on Martinez's default on the DKDJ and Martinez Notes, on his refusal to work with LANB to repay those loans, and on the financial drain created by the litigation to collect the amounts due.

{11} Ms. Terrazas confirmed these concerns. She testified that when Mr. Enloe informed her about the Board's decision, "he was concerned with their integrity, their dishonesty. The embezzlement had already started to come out. We also discussed the accounting issues that we had had with [MSS] with double-billing" She also testified herself about spending hours working every time she received an MSS invoice to verify its accuracy, time she testified she put in out of friendship with the Martinezes, even though the work was not profitable for Title Guaranty. Ms. Terrazas added that all of the other surveying firms on Title Guaranty's approved surveyor list at that time were required to have Errors and Omissions coverage to do work for Title Guaranty, and that MSS did not have Errors and Omissions insurance. She said that concern about potential liability to Title Guaranty and its customers was one reason for Title Guaranty's decision to stop initiating new contracts with MSS.

## DISCUSSION

{12} LANB argues that the district court's legal conclusion that LANB interfered with Defendants' prospective contractual relations was erroneous.

When a party is challenging a legal conclusion, the standard for review is whether the law correctly was applied to the facts, viewing them in a manner most favorable to the prevailing party, indulging all rea-

sonable inferences in support of the court's decision, and disregarding all inferences or evidence to the contrary.

*Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.,* 113 N.M. 9, 12, 820 P.2d 1323, 1326 (1991).

■ {13} In a cause of action for interference with prospective contractual relations, improper motive must be the *sole* motive for interfering with a prospective or at-will contract. *Fikes v. Furst,* 2003–NMSC–033, ¶ 21, 134 N.M. 602, 81 P.3d 545 (emphasis added). Interference with a prospective contract is therefore distinguishable from the cause of action for interference with an existing contract, which does not have this sole motive requirement. *Id.* As an alternative to showing improper motive, a plaintiff may also show that the defendant used improper means with the sole intention of harming the plaintiff by interfering with a prospective business advantage. *Silverman v. Progressive Broad., Inc.,* 1998–NMCA–107, ¶ 28, 125 N.M. 500, 964 P.2d 61. Where there is at least in part a legitimate business reason for the act, then a claim based on improper means fails. *See id.* LANB argues that the evidence does not support a finding of interference with prospective contractual relations because: (1) neither the evidence in the record nor the findings of the district court support a legal conclusion of conspiracy to interfere with prospective contractual relations based solely on an improper motive, and (2) none of the means used by the Title Guaranty and LANB Directors was improper or wrongful as a matter of law. Viewing the evidence in this case in the light most favorable to Defendants, we agree. Both improper motive and improper means are absent.

■ {14} The sole finding of fact by the district court regarding LANB's motive states: "One of the reasons that the directors of Title Guaranty who were also directors of LANB, decided to have Title Guaranty stop initiating orders from MSS was that Danny Martinez and Katherine Martinez were in default on their loans to LANB." We agree with LANB that the plain language of this finding does not support a legal conclusion that LANB's sole motive was to harm Defendants. Both *Furst* and *Silverman* make it clear that an improper motive may form a basis of the act that interferes with prospective contractual relations, as long as it is not the only motivation. Therefore LANB could not have committed interference with prospective contractual relations as a matter of law.

■ {15} We are persuaded that this finding was not in error because, as LANB points out, the district court rejected all of Defendants' proposed findings of fact that would have established that LANB's sole motive was to harm Defendants or that the reasons advanced by LANB were pretextual. Failure of a district court to make a finding of fact is regarded as a finding against the party seeking to establish the affirmative. *Landskroner v. McClure,* 107 N.M. 773, 775, 765 P.2d 189, 191 (1988). The district court also therefore implicitly found that sole motive did not exist for the additional reason that it refused to adopt any of Defendants' findings of fact that would have established sole motive. Therefore, sole motive cannot form the basis for the conclusion that LANB conspired to interfere with Defendants' prospective contractual relations.

{16} Defendants assert that LANB's argument is erroneously based on the assumption that the finding with the language "one of the reasons" is the sole finding of LANB's improper motive. They point to a number of requested findings that they submitted which the district court adopted which they claim demonstrates LANB's improper motive. The findings cited by Defendants address a number of factual issues, demonstrating that certain events occurred but they do not address motivation. Defendants also point out some of the proposed findings of LANB that were rejected by the district court. However, the negative of rejecting those findings requested by LANB does not establish the positive finding of a sole motive to harm.

{17} Finally, Defendants argue that this finding of fact does show that LANB's only motivation was to injure MSS

because the Title Guaranty Directors were also simultaneously LANB directors, so when they reached the decision for Title Guaranty to stop ordering surveys from

and to injure the business of MSS, based on Danny and Katherine Martinez's other loan defaults at LANB, their decision was not based on the business of MSS at Title Guaranty, but instead based on the business of LANB's other relations with Danny and Katherine Martinez.

This argument does not persuade us that we should read the district court's finding of fact differently from how it is written. Therefore we conclude that this argument regarding improper motive also fails.

{18} Next we address whether an improper means was used by LANB to interfere with Defendants' prospective contractual relations. Improper means includes both tortious and predatory behavior with the latter defined as being "wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Diversey Corp. v. Chem–Source Corp.*, 1998–NMCA–112, ¶ 21, 125 N.M. 748, 965 P.2d 332 (internal quotation marks and citations omitted). Examples of improper means include but are not limited to "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980) (internal quotation marks and citation omitted). We agree with LANB that the evidence fails to prove an improper means.

{19} LANB discusses the only findings of fact and conclusions of law in this case that might arguably support a conclusion that it used improper means to interfere with Defendants' prospective contractual relations. A review of these findings and conclusions supports LANB's position that no improper means were employed. We consider each of LANB's points.

{20} First, the district court concluded that: "LANB used the positions of Enloe, Wells and Kinsfather [sic] with Title Guaranty, and Enloe's position as the President of Title Guarantee [sic] and boss of Denise Terrazas to cause or coerce Title Guaranty to stop ordering the surveys from MSS. LANB argues that the conduct involved in connection with this conclusion law was not coercive as a matter of law because the record reflects only a conflict for Denise Terrazas between her duties as Title Guaranty's vice president and her loyalty to her friends, the Martinezes, and not any threats or intimidation on the part of LANB. LANB maintains that the implicit threat of a reduction in salary or discharge from employment if an employee fails to comply with lawful directives given to her is "an everyday circumstance which is not illegal or improper." We agree. The obligation of an employee to carry out lawful directives of a superior or board is not illegal or wrongful. Therefore, this conclusion of law does not support a holding that LANB used improper means to interfere with Defendants' prospective contractual relations.

{21} Defendants counter that because LANB does not challenge the court's findings regarding conspiracy, it is undisputed that LANB used improper means to interfere with MSS' prospective contractual relations because a conspiracy itself constitutes an improper means. Defendants' reasoning is circular. A civil conspiracy requires a "combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Seeds v. Lucero*, 2005–NMCA–067, ¶ 12, 137 N.M. 589, 113 P.3d 859 (internal quotation marks and citation omitted). Stated another way, an agreement by itself, without an independent, unlawful act, is not an improper means. Because there is neither an unlawful purpose nor an unlawful means in Title Guaranty's Board of Directors directing that Ms. Terrazas stop ordering surveys from MSS, there can be no conspiracy. Therefore we reject this argument.

{22} LANB also argues that the following conclusion of law fails to establish an improper means: "The decision of whether Title Guaranty stopped ordering surveys from MSS, its largest supplier of surveys, was not properly one to be made by LANB or by Enloe or any other persons who were LANB officers and directors, such as Messrs. Enloe, Wells and Kinsfather [sic]." LANB argues that this conclusion of law conflicts with settled law governing the operation of a corporation, which states that the board of directors of a corporation is charged with and

is ultimately responsible for the management of a corporation, citing to NMSA 1978, Section 53–11–35 (1987). LANB asserts that "[t]here is simply no independently wrongful action when the board of directors and the president and chief executive officer of a corporation directs the vice president of that corporation to carry out a decision of its board." Defendants respond with the argument that the general authority of corporate directors to manage a corporation does not apply here because "LANB is not any corporation; it is a national bank ... and its chief executive [officer] testified that as a national bank there are rules that prohibit LANB and Title Guaranty from commingling their businesses."

{23} We are not persuaded by Defendants' argument that LANB's status as a national bank requires that its corporate governance be somehow different from other corporations under New Mexico law. Nor are we persuaded that the decision by Title Guaranty's board members where some of the board members were also LANB board members to stop ordering surveys from MSS constitutes the improper commingling of business. Defendants' argument suggests that the mere fact that LANB and Title Guaranty had board members in common means that Title Guaranty's board members should have disregarded information that raised the issue of whether further dealings with MSS could be injurious to Title Guaranty. Given the undisputed embezzlement by one of MSS' owners along with other problematic indications such as MSS' billing practices, had Messrs. Enloe, Wells, and Kinsfather not considered whether to terminate ordering further surveys from MSS, their inaction may well have constituted a breach of their fiduciary duty to Title Guaranty to act in its best interests. *See* § 53–11–35(D). Defendants do not address whether the Board's action was in good faith and in the best interests of Title Guaranty, therefore their argument that the action was not privileged fails. We are further unpersuaded that federal banking regulations have any bearing on the issue. We therefore hold that the mere fact of common board members between LANB and Title Guaranty did not render the decision by Title Guaranty's Board of Directors to stop ordering surveys from MSS an improper means of interfering with MSS' prospective contractual relations.

{24} LANB finally argues that the following finding of fact does not demonstrate an improper means: "LANB impaired the collateral from MSS when it caused, and participated in, Title Guaranty's stoppage of ordering surveys from MSS." Defendants fail to cite any authority for the proposition that under the circumstances LANB was obligated to continue doing business with MSS in order to avoid impairing its collateral in violation of Article 9 of the Uniform Commercial Code (codified at NMSA 1978, Sections 55–9–101 to –710 (2001, as amended through 2005)), and we fail to find any such authority. We therefore conclude the finding that LANB interfered with Defendants' prospective contractual relations by the improper means of impairing the Collateral is not supported by the record.

{25} Defendants argue that LANB "accepted and ratified" the district court's judgment, thereby waiving its right to appeal. The factual basis for this contention is that Defendants filed a motion to vacate the judgment; LANB opposed Defendants' motion and argued that the judgment was consistent with the district court's filed findings of fact and conclusions of law. Defendants do not cite any authority for this novel proposition, so we do not address it. *See State v. Clifford,* 117 N.M. 508, 513, 873 P.2d 254, 259 (1994) (stating that our Supreme Court will not review issues raised in the appellate briefs that are unsupported by authority). Moreover, LANB argued to the district court that there were no facts in the record establishing that LANB engaged in any interference with the sole motive to harm Defendants and that the record conclusively showed that there were many reasons for Title Guaranty's decision to stop initiating survey orders from MSS. LANB also argued that the evidence failed to establish that LANB engaged in an act of interference by improper means. Therefore, LANB's arguments were preserved for our review. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) ("To preserve an issue for review on appeal, it must

appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.")

{26} For the reasons explained above, upon viewing the facts in the light most favorable to the judgment, we hold that the district court's conclusion that LANB interfered with Defendants' prospective contractual relations is not supported by the evidence in the record and we reverse. We therefore need not address LANB's additional argument that its actions were not the proximate cause of Defendants' damages.

{27} The district court's denial of LANB's request for attorney's fees was based on its conclusion that LANB precipitated Defendants' default under the loans by interfering with Defendants' prospective contractual relations. Because we hold that interference with prospective contractual relations did not occur, this is no longer a proper basis for denying LANB's request for accrued interest and attorney's fees. Furthermore, as the prevailing party, LANB is entitled to its costs in a sum to be determined on remand. Rule 1–054(D) NMRA.

## CONCLUSION

{28} The judgment in favor of Martinez and MSS on their counterclaim is reversed, and the cause is remanded for further proceedings consistent with this opinion. In all other respects, the judgment of the district court is affirmed.

{29} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and CELIA FOY CASTILLO, Judge.