2008-NMCA-101

191 P.3d 548

**GREGORY ROCKHOUSE RANCH, L.L.C., a New Mexico Limited Liability Company, Plaintiff–Appellant,**

v.

**GLENN'S WATER WELL SERVICE, INC., a New Mexico corporation, Clark A. Glenn, d/b/a Glenn's Water Well Service and Thomas Turney, New Mexico State Engineer, Defendants,**

and

Glenn's Water Well Service, Inc., a New Mexico corporation and Clark A. Glenn, d/b/a Glenn's Water Well Service, Counterclaimants/Cross–Claimants and Third–Party Plaintiffs–Appellees,

v.

United States of America/United States Department of the Interior/Bureau of Land Management, Thomas C. Turney, New Mexico State Engineer, Gregory Rockhouse Ranch, L.L.C., a New Mexico Limited Liability Company, Gregory Ranch, a New Mexico General Partnership, Norman Scott Gregory, Larry Gregory, Donald Wayne Gregory, Fred Kezar and Rita Kezar, Counterdefendants/Cross–Claim Defendants and Third–Party Defendants.

No. 25,963.

Court of Appeals of New Mexico.

April 22, 2008.

Certiorari Denied, No. 31,157, June 26, 2008.

Martin Law Firm, W.T. Martin, Jr., Kenneth D. Dugan, Carlsbad, NM, for Appellant.

Hennighausen & Olsen, L.L.P., A.J. Olsen, Alvin F. Jones, Sheryl L. Saavedra, LLC, Sheryl L. Saavedra, Roswell, NM, for Appellee.

## OPINION

VIGIL, Judge.

{1} Gregory Rockhouse Ranch, LLC, Gregory Ranch, Norman Scott Gregory, Larry Gregory, and Donald Wayne Gregory (collectively, Gregory) appeal from a judgment entered in favor of Glenn's Water Well Service, Inc., and Clark A. Glenn (collectively, Glenn) on Glenn's claims of slander of title and tortious interference with contractual relations. We conclude that the communications at issue in this case were privileged and, therefore, that the slander of title claim fails as a matter of law. Further, because there is no evidence in the record that Gregory's conduct induced any breach of contract, the tortious interference with contract claim cannot be sustained. We therefore reverse.

## BACKGROUND

{2} This appeal arises out of a dispute over entitlement to draw water from a well, denominated RA–5060, that is located on federal land. The RA–5060 well was drilled by the Lowe Drilling Company (Lowe) in 1962. In 1964 Lowe filed a Declaration of Owner-

ship of Underground Water Right in association with this well, claiming 7 acre-feet of commercial water rights. It appears that water ceased being produced from RA–5060 at some point in the 1970s, and the well was released to the Bureau of Land Management (BLM) in 1974. The record contains no indication of any further activity with respect to RA–5060 for many years thereafter.

{3} On September 20, 1996, Lowe applied to the Office of the State Engineer (OSE) for a one-year emergency permit to change the location of the water rights associated with RA–5060. The OSE issued a letter to Lowe on October 4, 1996, stating that the application had been denied, and following further proceedings, the OSE formally denied Lowe's application on February 7, 1998, on the ground that "the Water Right has been abandoned at the move-from location."

{4} In November 1997, before the OSE issued its formal decision on the aforementioned application, Lowe filed a change of ownership document with the OSE purporting to convey to Glenn the commercial water rights associated with RA–5060 that Lowe had declared in 1964. In late 1997, Glenn began obtaining temporary permits from the OSE to draw limited quantities of water from RA–5060. Glenn also sought authorization from the BLM to make use of the well, representing in the application that Glenn owned RA–5060 and the associated water rights. The BLM issued the requested right-of-way to Glenn in 1998.

{5} Shortly after Glenn obtained the aforementioned permits and right-of-way, Gregory began corresponding with the BLM and the OSE about the status of RA–5060 and the associated water rights. The first letter of consequence was sent to the BLM on September 15, 1999. In that letter, Gregory expressed the "belief" that "Glenn's ownership of said well, as well as the water right, is in dispute and was improperly obtained." Gregory therefore requested that the BLM "investigate as soon as possible to make a determination of ownership." Gregory also submitted a permit application to the BLM, seeking authorization to use RA–5060. The BLM issued the requested right-of-way to Gregory, and the BLM began making inqui-

ries about the legal status of RA–5060, together with the associated water rights.

{6} On November 19, 1999, Gregory sent a letter to the OSE, explaining that Gregory had interests surrounding RA–5060. Gregory indicated that its investigation had revealed that the BLM owned the well. With respect to Glenn's interests, Gregory asserted that "Glenn had falsely claimed that he owned the water well as well as had a valid commercial water right attached to the well. It is clear both [statements] are false and that he has no such rights." Gregory went on to explain that it was seeking permission to use RA–5060, and that it would "strongly protest . . . the granting of any . . . right to Mr. Glenn in light of his previous fraud."

{7} In late November 1999, Glenn entered into an agreement with Seven Rivers, Inc., whereby Glenn agreed to lease 50 acre-feet of water from Seven Rivers for a period of two years, contingent upon receipt of approval of a temporary transfer of the water to the RA–5060 location. To that end, Seven Rivers promptly filed an application for the requisite transfer with the OSE (the Seven Rivers application).

{8} On December 7, 1999, Gregory filed a formal protest against the Seven Rivers application. This was followed by a letter dated December 21, 1999, in which Gregory elaborated on its opposition to the Seven Rivers application. Gregory asserted that "no water right exists in the subject well, RA–5060, because the water right was forfeited many years ago due to failure to put the water to beneficial use." Gregory further contended that "Glenn has been making false representations trying to obtain a water right from the State Engineer in order for him to commercially sell water from that well." While acknowledging that Glenn had obtained a permit from the BLM to use the surface surrounding RA–5060, Gregory contended that the permit was obtained by falsely representing that Glenn owned the well. Gregory indicated that the BLM was investigating whether Glenn "should be subject to disciplinary action." Finally, Gregory claimed that its commercial interests would be "severely and adversely impact[ed]" if Glenn was permitted to draw water from

RA–5060, and closed by urging the OSE "not [to] allow or sanction the fraudulent appropriation of a water right by Mr. Glenn."

{9} In December 1999, the BLM apparently concluded its preliminary inquiries about the status of RA–5060 and the associated water rights. The BLM determined that it owned the well by virtue of the 1974 release. Upon the advice of the OSE, the BLM also concluded that it owned the associated water rights. The BLM therefore filed a change of ownership document with the OSE on January 3, 2000.

{10} On May 10, 2000, Gregory sent another letter to the OSE. As mentioned above, the BLM had previously issued a right-of-way to Gregory. In the letter of May 10, 2000, Gregory asserted that this right-of-way granted it "the *exclusive* right to utilize" RA–5060, as well as "sole authority to authorize use of [its] well" by any third party. Gregory closed by reiterating its position that, due to abandonment, "no valid water rights exist concerning this well."

{11} On May 26, 2000, the BLM sent a letter to Glenn indicating that it had received information from the OSE signifying that Glenn lacked any water rights in association with RA–5060. As a consequence, the BLM opined that Glenn lacked any basis for utilizing RA–5060.

{12} On June 5, 2000, Gregory sent another letter to the BLM. In this letter Gregory once again asserted that Glenn lacked any valid water rights in association with RA–5060 and expressed continuing opposition to the pending Seven Rivers Application. Gregory further noted that it had obtained a right-of-way from the BLM authorizing it to utilize RA–5060, and Gregory claimed that Glenn's proposed use of the well would interfere with Gregory's rights. While acknowledging that Glenn had also obtained a right-of-way from the BLM, Gregory asserted that Glenn's right-of-way "was obtained under false pretenses, namely that not only did Glenn claim ownership of this well, but also ownership of valid water rights attached to the well." Gregory therefore indicated that it expected the BLM to deny Glenn, Seven Rivers, and all others permission either to utilize RA–5060 or to transfer water to RA–5060.

{13} By the time the June 5 letter was sent to the BLM, Gregory was actively seeking to transfer water rights to RA–5060 so that it could begin drawing water from the well. To this end, an application for temporary change of location was filed with the OSE on June 23, 2000. Glenn promptly protested, and progress on the proposed transfer was halted. Similarly, on June 27, 2000, the pending Seven Rivers application was stayed.

{14} On December 5, 2000, Gregory filed suit, seeking to enjoin Glenn from drawing water from RA–5060. A series of counter-claims, cross-claims, third-party claims, and parallel proceedings ensued, to which the OSE and the BLM were joined. A full description of these developments is unnecessary. Ultimately, the BLM withdrew its claim to the water rights associated with RA–5060, and a consent order was entered on December 20, 2002, recognizing that Glenn possesses 6 acre-feet of commercial water rights, subject to future developments in the course of the *inter se* phase of the Pecos River adjudication.

{15} Following the entry of the consent order, Glenn's claims for slander of title, tortious interference with contract, and prima facie tort were tried. The district court entered judgment in Glenn's favor on both the slander of title and the tortious interference with contract claims. The district court rejected Glenn's prima facie tort claim. This appeal followed.

**STANDARD OF REVIEW**

{16} Gregory challenges the sufficiency of the evidence to support many of the district court's findings and also advances a number of strictly legal arguments. To the extent that the district court's findings are pertinent to our review of the merits, we view the evidence in the light most favorable to the findings, indulging all reasonable inferences in support of the district court's decision, and disregarding all evidence to the contrary. *State of N.M. ex rel. Madrid v. UU Bar Ranch Ltd. P'ship*, 2005–NMCA–079, ¶ 11, 137 N.M. 719, 114 P.3d 399. We review the legal issues de novo. *Leigh v. Vill. of Los*

*Lunas,* 2005–NMCA–025, ¶ 5, 137 N.M. 119, 108 P.3d 525.

## DISCUSSION

### A. Slander of Title

■ {17} "Slander of title occurs when one who, *without the privilege to do so,* willfully records or publishes matter 'which is untrue and disparaging to another's property rights in land as would lead a reasonable man to foresee that the conduct of a third [person as] purchaser might be determined thereby.'" *Vill. of Wagon Mound v. Mora Trust,* 2003–NMCA–035, ¶ 74, 133 N.M. 373, 62 P.3d 1255 (emphasis added) (quoting *Den–Gar Enters. v. Romero,* 94 N.M. 425, 430, 611 P.2d 1119, 1124 (Ct.App.1980)). Gregory argues that the communications upon which the slander of title claim is based are privileged, either absolutely or qualifiedly.

### 1. Absolute Privilege

■ {18} "An absolute or unqualified privilege means absolute immunity from liability for defamation." *Neece v. Kantu,* 84 N.M. 700, 705, 507 P.2d 447, 452 (Ct.App. 1973). Generally, statements made in the course of judicial proceedings enjoy an absolute privilege from later charges of defamation or slander of title. *Superior Constr., Inc. v. Linnerooth,* 103 N.M. 716, 719, 712 P.2d 1378, 1381 (1986); *and see generally* Restatement (Second) of Torts § 635 (1977) (providing that the varieties of absolute privilege which apply to defamation also apply to the tort of injurious falsehood—i.e., slander of title). Under appropriate circumstances, this privilege applies even to statements made outside the proceedings themselves:

> It is not absolutely essential, in order to obtain the benefits of absolute privilege, that the language claimed to be defamatory be spoken in open court or contained in a pleading, brief, or affidavit. . . . If the alleged defamatory statement is made to achieve the objects of the litigation, the absolute privilege applies even though the statement is made outside the courtroom and no function of the court or its officers is invoked.

*Romero v. Prince,* 85 N.M. 474, 477, 513 P.2d 717, 720 (Ct.App.1973) (alteration in original) (internal quotation marks and cita-

tion omitted). In reliance upon the foregoing principles, Gregory asserts that all pertinent communications in this case were absolutely privileged.

{19} Glenn's slander of title claim is predicated upon the series of letters sent by Gregory to the BLM and the OSE between September 15, 1999, and June 5, 2000. Judicial proceedings were initiated on December 5, 2000. Accordingly, a period of months or more separates the various letters from the judicial proceedings. Although we acknowledge that statements made in close proximity to the initiation of judicial proceedings may be absolutely privileged, *see Penny v. Sherman,* 101 N.M. 517, 520, 684 P.2d 1182, 1185 (Ct.App.1984) (observing that statements made in relation to "an ongoing or contemplated judicial proceeding" may be absolutely privileged), we find no authority to support extension of this privilege to communications made so far in advance of litigation. Nor do we find any indication that litigation was seriously contemplated at the time that the communications were made. We regard this as fatal to Gregory's claim of absolute privilege. *See* Restatement (Second) of Torts § 587 cmt. e (1977) (observing that, with respect to communications which are preliminary to a judicial proceeding, the absolute privilege applies only if a proceeding "is contemplated in good faith and under serious consideration" at the time the communication is made).

■ {20} Alternatively, Gregory argues that insofar as the letters to the BLM and the OSE were submitted in the course of administrative proceedings, they should be absolutely privileged. We are unpersuaded.

■ {21} Although an absolute privilege has been extended to certain classes of administrative proceedings, our authorities point out that this is only the case if the proceedings are quasi-judicial in nature. *See, e.g., Zuniga v. Sears, Roebuck & Co.,* 100 N.M. 414, 417, 671 P.2d 662, 665 (Ct.App. 1983) ("There is an absolute immunity from liability for defamatory statements made in court proceedings or at administrative hearings."); *Franklin v. Blank,* 86 N.M. 585, 586, 525 P.2d 945, 946 (Ct.App.1974) (discussing

the application of an absolute privilege to "quasi-judicial proceedings" involving peer review), *superseded by statute as stated in Leyba v. Renger,* 114 N.M. 686, 686, 845 P.2d 780, 780 (1992); *Neece,* 84 N.M. at 705–07, 507 P.2d at 452–54 (applying an absolute privilege with respect to statements made in the course of "quasi-judicial" proceedings conducted by a hearing officer). "A quasi-judicial administrative action is one that possesses certain 'trappings required by due process, e.g., notice, hearing, and opportunity to present witnesses.'" *Southworth v. Santa Fe Servs., Inc.,* 1998–NMCA–109, ¶ 14, 125 N.M. 489, 963 P.2d 566 (quoting *Rainaldi v. Public Employees Retirement Bd.,* 115 N.M. 650, 653, 857 P.2d 761, 764 (1993)); *see also Montoya v. Dep't of Fin. & Admin.,* 98 N.M. 408, 413, 649 P.2d 476, 481 (Ct.App.1982) (observing that quasi-judicial capacity involves "the taking of evidence and testimony and the rendering of a decision including findings of fact and conclusions of law").

{22} As described above, the BLM and the OSE were presented with numerous permit applications throughout the period during which the communications at issue in this case were made. Although we may reasonably assume that the permit applications precipitated some sort of administrative activity, we find no indication in the record that quasi-judicial proceedings took place. We therefore decline Gregory's invitation to extend an absolute privilege to the communications at issue in this case, based solely upon the pendency of the various permit applications. *See generally Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 209, 880 P.2d 300, 306 (1994) (observing that the appellant bears the burden of providing a record sufficient to justify reversal), *limited on other grounds by Sloan v. State Farm Mut. Auto. Ins. Co.,* 2004–NMSC–004, ¶ 12, 135 N.M. 106, 85 P.3d 230.

█ {23} Gregory has also suggested that an absolute privilege should apply in this case because the BLM and the OSE are within the executive branch of government. Although we acknowledge that executive communications are absolutely privileged, *see Baker v. Bhajan,* 117 N.M. 278, 281, 871 P.2d 374, 377 (1994), only statements made *by* executive officers are so privileged. *See Adams v. Tatsch,* 68 N.M. 446, 450–53, 362 P.2d 984, 987–89 (1961) (observing that the privilege applies for the benefit of executive officers as publishers). No basis for classifying Gregory as an executive officer has been suggested. The absolute privilege associated with executive communications is therefore inapplicable.

█ {24} Finally, Gregory asserts that all of the statements at issue in this case should be absolutely privileged on grounds that they were made in the exercise of the constitutional right to petition the government and pursuant to a statutory right to protest. However, we are aware of no authority for the proposition that statements directed to governmental authorities and nominally designated petitions or protests should be categorically privileged. To the extent that Gregory's arguments constitute a request to recognize such a broad and far reaching rule, we decline to do so.

## 2. Qualified Privilege

█ {25} Although "[t]he application of an absolute privilege is confined to very few situations," *Baker,* 117 N.M. at 281, 871 P.2d at 377, qualified privileges apply to a broader array of circumstances. Although several formulations of qualified privilege might apply to the facts of this case, we hold that two are applicable.

█ {26} First, a qualified privilege applies to communications that are made by individuals or entities with legitimate interests at stake:

An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

Restatement (Second) of Torts § 594 (1977).

█ {27} Second, a qualified privilege applies to communications that are made to

individuals or entities who may act in the public interest:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> > (a) there is information that affects a sufficiently important public interest, and
> >
> > (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

Restatement (Second) of Torts § 598 (1977).

{28} Although the preceding Restatement sections do not appear to have been specifically adopted in this State in prior published decisions, we find precedent for their application in principle. *See, e.g., Baker,* 117 N.M. at 282–83, 871 P.2d at 378–79 (observing that statements made by a former employer to the governor's office and the attorney general about a candidate for employment with the New Mexico State Police were subject to a qualified privilege, insofar as the statements were made by and to persons or entities with legitimate interests at stake). Because these Restatement sections provide clear, concise formulations, we rely upon them to guide our analysis.

{29} We find compelling support to apply both Section 594 and Section 598 under the facts of this case. *See generally Furgason v. Clausen,* 109 N.M. 331, 334, 785 P.2d 242, 245 (Ct.App.1989) ("Determination of whether a privilege applies to material alleged to be defamatory is a question of law to be decided by the court.") We therefore conclude that the communications at issue are conditionally privileged.

{30} The first prong of the analysis under both Section 594 and Section 598 entails an evaluation of the surrounding circumstances to determine whether they could be said to have induced a correct or reasonable belief that the communicated information affected substantial public or private interests. The letters at issue in this case all concerned Glenn's entitlement to use RA–5060 and the associated water rights. Gregory, the BLM, and the OSE all had clear, demonstrable interests in the subject matter. Gregory's interest was in obtaining the right to make commercial use of the well pursuant to the right-of-way that it obtained from the BLM as well as the leases and temporary transfers of water rights that Gregory pursued over time. The BLM's interest was in identifying and asserting any rights that it possessed by virtue of the 1974 release. The OSE's interest was in clarifying the status of the water rights associated with RA–5060 and ensuring that those rights were not improperly utilized pursuant to its statutory mandate. *See generally* NMSA 1978, § 72–2–1 (1982) (providing that the state engineer "has general supervision of waters of the state and of the measurement, appropriation, [and] distribution thereof"). We therefore conclude that the circumstances could have induced a correct or reasonable belief that the information communicated in Gregory's letters affected substantial public or private interests. This satisfies the first prong of the analysis.

{31} The second prong of the analysis under both Section 594 and Section 598 entails evaluation of the audience and the apparent utility of the communications. All of the communications at issue in this case were directed to the BLM or the OSE. Insofar as the BLM controls the federal land upon which RA–5060 is situated, and insofar as the OSE administers all water rights throughout the State, *see generally* Section 72–2–1, it is clear that these entities were appropriate audiences.

{32} With respect to the apparent utility of the communications, we note that the letters motivated both the BLM and the OSE to conduct inquiries. In light of the information gathered in the course of those inquiries, the BLM advanced claims to both the well and the associated water rights. Both the BLM and the OSE ultimately took active parts in the litigation, which resulted in the entry of the consent order by which the status of RA–5060 and the associated water rights were clarified. As these developments illustrate, the surrounding circumstances were clearly sufficient to induce a correct or reasonable belief that the communications would be of service to the public and private interests implicated. Accordingly, the second prong of the analysis is satisfied as well.

{33} The foregoing analysis suggests that the communications at issue in this case were conditionally privileged. However, a privilege of this nature may be lost if it is abused. *Baker*, 117 N.M. at 283, 871 P.2d at 379.

> Abuse [of privilege] arises out of the publisher's lack of belief, or reasonable grounds for belief, in the truth of the alleged defamation; by the publication of the material for an improper use; by the publication to a person not reasonably necessary for the accomplishment of the purpose; or by publication not reasonably necessary to accomplish the purpose.

*Id.* (alteration in original) (quoting *Gengler v. Phelps*, 92 N.M. 465, 468, 589 P.2d 1056, 1059 (Ct.App.1978)). Glenn argues that the first listed form of abuse, lack of reasonable grounds for belief in the truth of the alleged defamation, should apply.

{34} Whether a qualified privilege has been abused is typically a question reserved for the trier of fact. *See Stewart v. Ging*, 64 N.M. 270, 274–75, 327 P.2d 333, 336 (1958). In this case, the district court entered no findings on the subject of privilege. However, "when there is no question of fact with regard to abuse of immunity," the issue may be resolved as a matter of law. *Salazar v. Bjork*, 85 N.M. 94, 97, 509 P.2d 569, 572 (Ct.App.1973). In this case, the critical facts are undisputed, and this Court may resolve the question of abuse as a matter of law.

{35} As previously stated, all of the communications at issue disparaged Glenn's entitlement to use RA–5060 and the associated water rights. Although Glenn's claims were *ultimately* vindicated, prior to the entry of the consent order, the status of RA–5060 was very unclear, as illustrated by the evolving views of the OSE and the BLM. Beginning as early as October 4, 1996, and until as late as December 4, 2000, the OSE explicitly and repeatedly took the position that the water rights had been abandoned. Later, the OSE appears to have revised its assessment, concluding that the BLM had obtained the water rights by virtue of the 1974 release. The BLM shared this view and also claimed ownership of RA–5060 itself. As previously mentioned, the OSE and the BLM arrived at

these conclusions, which were uniformly adverse to Glenn's claims, after conducting their own independent inquiries. These conditions demonstrate that there were eminently reasonable grounds for Gregory to challenge Glenn's entitlement to use RA–5060 and the associated water rights.

{36} We understand Glenn to suggest that even if there were reasonable grounds for a belief in the truth of Gregory's initial statements, Gregory lacked reasonable grounds to *continue* challenging Glenn's rights after the consent order was entered. However, by the time the consent order was entered in 2002, the parties were mired in ongoing litigation. The absolute privilege associated with judicial proceedings therefore precludes any reliance upon later developments to support the slander of title claim.

{37} In summary, therefore, we conclude that all of the statements at issue in this case were privileged. This is fatal to Glenn's slander of title claim.

**B. Tortious Interference with Contract**

{38} Glenn also prevailed on its claim of tortious interference with contract based upon the adverse impact that Gregory's conduct had upon the Seven Rivers agreement. To prove its claim for tortious interference with contract, Glenn was required to prove that (1) Gregory had knowledge of the contract between Glenn and Seven Rivers, (2) performance of the contract was refused, (3) Gregory played an active and substantial part in causing Glenn to lose the benefits of the contract, (4) damages flowed from the breach of contract, and (5) Gregory induced the breach without justification or privilege. *See Guest v. Berardinelli*, 2008–NMCA–144, ¶ 32, 145 N.M. 186, 195 P.3d 353 [No. 26,813 (N.M.Ct.App. Feb. 29, 2008) ]; *Ettenson v. Burke*, 2001–NMCA–003, ¶ 14, 130 N.M. 67, 17 P.3d 440.

{39} With the foregoing principles in mind, we turn to the evidence presented in this case. The Seven Rivers contract took the form of a lease agreement by which Glenn agreed to lease 50 acre-feet of water from Seven Rivers for a fixed price, "contingent upon [Glenn's] obtaining approval from the

[OSE] to temporarily change the point of diversion and place of use of the water rights" to the RA–5060 location. Although the parties pursued the necessary approval from the OSE, it was not forthcoming, and the lease agreement expired.

{40} The district court found that Gregory's course of conduct prevented Glenn and Seven Rivers from obtaining approval from the OSE. This supplied the basis for the ultimate decision in Glenn's favor.

{41} The difficulty with the approach taken by the district court is that it equates the expiration of the lease agreement with a breach of contract. The provision in the Seven Rivers agreement that made the lease obligations "contingent upon ... obtaining approval from the State Engineer" constituted a condition. Whether characterized as a condition precedent or a condition subsequent, the non-occurrence of the condition relieved the parties of further responsibilities, thereby precluding either party from actually breaching. *See generally K.L. Conwell Corp. v. City of Albuquerque*, 111 N.M. 125, 129, 802 P.2d 634, 638 (1990) (discussing conditions precedent and conditions subsequent, and observing that in the former case the condition must occur before there can be a breach of contractual duty, while in the latter case the contractual duty is discharged).

{42} Glenn suggests that the district court ruling might be sustained on the alternative theory that Gregory's conduct interfered with Glenn's contractual relations with the BLM and the OSE. However, the district court relied exclusively on the Seven Rivers agreement to support its ruling on the tortious interference with contract claim. In its findings, the court implicitly rejected the theory that Gregory's conduct interfered with contractual relationships with the BLM and the OSE. As a result, there is no factual predicate to support Glenn's alternative theory. *See generally Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC*, 2006–NMCA–081, ¶ 15, 140 N.M. 41, 139 P.3d 201 ("Failure of a district court to make a finding of fact is regarded as a finding against the party seeking to establish the affirmative.").

{43} Glenn's claim might have been recharacterized to avoid the problem presented by the absence of any breach of contract. "A claim for tortious interference with contractual relations that does not induce the breach of an existing contract is in the nature of a claim for interference with prospective business advantage[.]" *Silverman v. Progressive Broad., Inc.*, 1998–NMCA–107, ¶ 28, 125 N.M. 500, 964 P.2d 61. To prove a claim of intentional interference with prospective contractual relations, Glenn was required to establish that Gregory either induced Seven Rivers not to enter into or continue a prospective relation with Glenn, or prevented Glenn from acquiring or continuing a prospective relation with Seven Rivers, by interfering through improper means or with an improper motive. *See Guest*, 2008–NMCA–144, ¶ 32.

{44} We find no evidence in the record to suggest that Glenn's relationship with Seven Rivers ended as a result of Gregory's actions. To the contrary, Glenn and Seven Rivers renewed their conditional lease agreement. This state of affairs negates both prongs of any claim of intentional interference with prospective contractual relations. *See id.* ¶ 34 (observing that where the undisputed evidence shows that a plaintiff's relationship with a third party did not end as a result of the defendant's improper action, there is no basis for any claim of intentional interference with prospective contractual relations).

{45} In summary, the evidence presented below, together with the findings of the district court, fail to satisfy the essential elements of tortious interference with contractual relations. Glenn's claim therefore fails as a matter of law. *See generally Am. Employers' Ins. Co. v. Crawford*, 87 N.M. 375, 376, 533 P.2d 1203, 1204 (1975) ("It is fundamental that the evidence adduced must support all issues of fact essential to the maintenance of a legally recognized and enforceable claim. Otherwise, there can be no basis in fact for the claim, and it must be dismissed as a matter of law.").

**CONCLUSION**

{46} For the foregoing reasons, we reverse the award in Glenn's favor with respect to the claims of slander of title and tortious

interference with contract. As a consequence, the awards of punitive damages, attorney fees, and costs must also be overturned. We therefore reverse and remand for the entry of a judgment in conformity with this decision.

{47} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CYNTHIA A. FRY, Judges.