IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-021

Filing Date: June 28, 2012

Docket No. 32,985

HELENA CHEMICAL COMPANY,

      Plaintiff-Respondent,

v.

PAMELA URIBE and LINDA THOMAS, individually
and as representative of THOMAS & WAN, L.L.P., and
THOMAS & WAN, L.L.P.,

      Defendants-Petitioners.

and

Docket No. 32,987

HELENA CHEMICAL COMPANY,

      Plaintiff-Petitioner,

v.

PAMELA URIBE and LINDA THOMAS, individually
and as representative of THOMAS & WAN, L.L.P., and
THOMAS & WAN, L.L.P.,

      Defendants-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Jerald Alan Valentine, District Judge**

Freedman, Boyd, Hollander, Goldberg, Ives & Duncan, P.A.
Sara K. Berger
Albuquerque, NM

Law Office of Jack Brant, P.C.

John M. Brant
Albuquerque, NM

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Charles K. Purcell
Albuquerque, NM

for Petitioners

The Simons Law Firm, L.L.P.
Frank M. Bond
Faith Lesley Kalman Reyes
Santa Fe, NM

Jackson Walker, L.L.P.
Robert L. Soza, Jr.
Elena P. Villaseñor
San Antonio, TX

for Respondent

**OPINION**

**CHÁVEZ, Justice.**

**{1}**     This case concerns the scope of the absolute privilege that grants immunity to litigants and their attorneys from being sued for defamation based on public statements they make about a judicial proceeding either before and/or after the judicial proceeding is filed. The specific issues in this case are whether (1) pre-litigation statements made by an attorney to prospective clients, in the presence of the press, regarding a potential mass-tort lawsuit, and (2) statements made directly to the press by an attorney or a party, after such a lawsuit is filed, that repeat or explain the allegations of the complaint, are absolutely privileged, thus barring a lawsuit for defamation. The district court found in the affirmative on these issues and granted summary judgment to the defendants in this defamation lawsuit. The Court of Appeals reversed the summary judgment, holding that the absolute privilege doctrine does not apply to statements made either before or after a complaint is filed when the statements are made in the presence of the press. *Helena Chem. Co. v. Uribe*, 2011-NMCA-060, ¶¶ 21-28, 30, 149 N.M. 789, 255 P.3d 367.

**{2}**     We hold that the absolute privilege doctrine applies to pre-litigation statements made by attorneys in the presence of the press, *if* (1) the speaker is seriously and in good faith contemplating class action or mass-tort litigation at the time the statement is made, (2) the statement is reasonably related to the proposed litigation, (3) the attorney has a client or identifiable prospective client at the time the statement is made, and (4) the statement is

2

made while the attorney is acting in the capacity of counsel or prospective counsel. These statements are absolutely privileged because the use of the press to educate the public about a potential good-faith class action or mass-tort lawsuit and/or to identify additional litigants is reasonably related to the judicial proceeding. We also hold that statements made by litigants or their attorneys to the press after the lawsuit has been filed are absolutely privileged if the statements are a repetition or an explanation of the allegations in the pleading.

**{3}** The pre-litigation statements at issue in this case were made (1) when a mass-tort lawsuit was seriously and in good faith being contemplated, and (2) with the objectives of investigating the merits of potential litigation and identifying for the community those members who may have had a good-faith basis to pursue the litigation. These objectives were reasonably related to the contemplated judicial proceeding. In addition, the statements were made when attorney Linda Thomas (Thomas) had identifiable prospective clients in Mesquite, New Mexico and were made while Thomas was acting in her capacity as prospective counsel. We also conclude that the post-filing statements are absolutely privileged because the statements either repeated or explained some of the allegations in the mass-tort complaint. Therefore, all of the statements are absolutely privileged and the district court was correct to grant summary judgment to the defendants. Accordingly, we reverse the Court of Appeals and affirm the district court.

## I.      BACKGROUND

**{4}** Helena Chemical Co. (Helena) is a crop protection company that owns and operates a facility in Mesquite, New Mexico. Helena sued the defendants, Thomas, her law firm, Thomas & Wan, L.L.P. (Thomas & Wan), and her client, Pamela Uribe (Ms. Uribe), for defamation. Helena alleges that Thomas made three statements and Ms. Uribe made one statement which defamed Helena.

**{5}** Thomas allegedly made two statements during a Mesquite community meeting in December 2007. Arturo Uribe (Mr. Uribe), the organizer of the Mesquite Community Action Committee, organized the public meeting because the Mesquite community was concerned about environmental and health hazards allegedly caused by toxic chemicals emanating from Helena's Mesquite plant. Mr. Uribe invited attorneys Thomas and Michelle Wan (Wan) to discuss the community concerns and possible litigation against Helena. Mr. Uribe invited Thomas and Wan because they had previously filed a toxic tort lawsuit against Helena in Texas for similar environmental and health hazards.

**{6}** Mr. Uribe also invited political blogger Heath Haussamen (Haussamen) to attend the public meeting in his capacity as a news reporter. Haussamen wrote and published a story about the public meeting on his website *Heath Haussamen on New Mexico Politics*.

**{7}** During this meeting, Thomas allegedly stated that "children are out here and they're playing in the yard, they're putting their hands in their mouth [sic], so they're really getting

3

a dose that way. Kids are at a much greater risk." Thomas also allegedly stated that Helena's actions appeared to be "pretty egregious." Haussamen referred to one of Thomas's alleged defamatory statements, "that Helena's actions in Mesquite appeared to be 'pretty egregious,'" in his background discussion of the proposed lawsuit.

{8}     Thomas & Wan filed a lawsuit in Santa Fe County, New Mexico against Helena ten months after the public meeting on behalf of the Uribes and the other residents of Mesquite. The day after the lawsuit was filed, Thomas held a press conference in Mesquite to discuss the fact that the lawsuit had been filed. Thomas allegedly made a third defamatory statement during this press conference when she stated that "[t]he underground water has been contaminated." Ms. Uribe also spoke during the press conference, describing her children's medical issues as "upper respiratory problems, pneumonia and bad allergies, [and] bloody noses."

{9}     Helena filed suit against Thomas, the Uribes, and Thomas & Wan (hereinafter referred to collectively as Thomas and Uribe) for defamation in Las Cruces, New Mexico. Thomas and Uribe filed motions for summary judgment, asserting that Helena's defamation lawsuit is barred as a matter of law based on the absolute privilege doctrine because their statements were made in the course of contemplated or pending litigation and were related to the judicial proceeding. The district court granted their motions for summary judgment, and Helena appealed to the Court of Appeals.

{10}    The Court of Appeals acknowledged that (1) Thomas's statements during the public meeting were made when the community and Thomas "in good faith contemplated and gave serious consideration to initiating a judicial proceeding," *Helena Chem. Co.*, 2011-NMCA-060, ¶ 18, and (2) the news reporters were invited to the public meeting and to the press conference "with the desire to inform the public through the news media about the residents' environmental and health concerns and activities related to Helena, if not also to inform the public that a judicial proceeding was contemplated or initiated," *id.* ¶ 20. However, the Court of Appeals reversed the district court's grant of a summary judgment, concluding that the statements were not absolutely privileged because they were made in the presence of the press, who did not have a relationship to or interest in the judicial proceeding. *Id.* ¶ 33. The rationale for the Court of Appeals' holding was that the statements to the media "did not serve the purpose of the judicial proceeding, enhance its function, or legitimately achieve its objects," nor did the statements "assist attorneys in investigating claims or in fully presenting claims in court"; rather, the statements "could have taint[ed] prospective jurors." *Id.* ¶ 31. Therefore, "use of the news media was unnecessary and excessive." *Id.* We granted both petitions for writ of certiorari that were filed in this case, and for the reasons that follow, reverse the Court of Appeals and affirm the district court.

## II.     THE LAW OF ABSOLUTE PRIVILEGE

{11}    We review motions for summary judgment and the question of whether a privilege exists de novo. *See Cable v. Wells Fargo Bank N.M., N.A. (In re Cable Family Trust)*, 2010-

4

NMSC-017, ¶ 9, 148 N.M. 127, 231 P.3d 108 (applying this standard to motions for summary judgment); *Gregory Rockhouse Ranch, L.L.C. v. Glenn's Water Well Serv., Inc.*, 2008-NMCA-101, ¶¶ 16, 18, 144 N.M. 690, 191 P.3d 548 (reviewing de novo the applicability of absolute privilege). Because substantive law is the filter through which we analyze motions for summary judgment, we first analyze the substantive law in New Mexico regarding absolute privilege.

{12} The Court of Appeals is the only appellate court in New Mexico, until today, to address the absolute privilege doctrine. In *Romero v. Prince*, 85 N.M. 474, 476-77, 513 P.2d 717, 719-20 (Ct. App. 1973), the Court of Appeals followed Restatement of Torts § 586 (1938) (now codified as Restatement (Second) of Torts § 586 (1977)), which states:

> An attorney at law is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding in which he [or she] participates as counsel, if it has some relation thereto.

The policy basis for the absolute privilege doctrine is the desire to afford "'attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients.'" *Romero,* 85 N.M. at 476, 513 P.2d at 719 (quoting Restatement of Torts § 586 cmt. a).

{13} The *Romero* court summarized the absolute privilege doctrine to mean that "a defamatory statement of an attorney is absolutely privileged if the statement is made during the course of and as a part of judicial proceedings and is related to those proceedings." 85 N.M. at 476, 513 P.2d at 719. The *Romero* court also clarified that the privilege applies even when the statement is not spoken in open court or contained within a court pleading. *Id.* at 477, 513 P.2d at 720. In *Romero*, the Court of Appeals applied the privilege to a lawyer's settlement letter, although the letter was copied to someone who was not involved in the legal proceeding but was "'directly affected by the lawsuit.'" *Id.* The rationale for extending the privilege was that the attorney's letter was written to achieve the objects of the litigation. *Id.* Thus, if the out-of-court statement is made to achieve the objects of the litigation, the statement is related to the judicial proceeding.

{14} In a subsequent opinion, the Court of Appeals explained that publishing a statement "to a person with a direct interest in the judicial proceeding is not an independent element in the absolute privilege analysis." *Penny v. Sherman*, 101 N.M. 517, 520, 684 P.2d 1182, 1185 (Ct. App. 1984). Instead, the direct interest of the third-party recipient is only a factor in considering whether the statement is related to the judicial proceeding. *Id.*

{15} The most recent Court of Appeals' opinion to address the privilege before this case is *Gregory Rockhouse Ranch*, 2008-NMCA-101. The *Gregory Rockhouse Ranch* court analyzed whether a series of letters over a period of several months before a judicial proceeding was initiated was absolutely privileged. *Id.* ¶ 19. The court quoted Restatement

5

(Second) of Torts § 587 comment e (1977) for the proposition that the absolute privilege applies to communications that precede a judicial proceeding as long as the "proceeding 'is contemplated in good faith and under serious consideration' at the time the communication is made." *Gregory Rockhouse Ranch*, 2008-NMCA-101, ¶ 19. Although the Court of Appeals did not find "authority to support extension of this privilege to communications made so far in advance of litigation," *id.*, in our opinion, temporal proximity should not be a factor in the analysis. We do not conclude that this type of post-hoc analysis is required or warranted by Restatement (Second) of Torts § 587, because such logic could deprive parties of the protection of the privilege, even if they contemplated litigation seriously and in good faith but did not pursue the litigation because the course of litigation took an unpredictable path. *See Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*, 434 U.S. 412, 422 (1978) (discussing the unpredictable nature of litigation). For example, the speaker may have seriously and in good faith contemplated a judicial proceeding, but decided against pursuing the litigation for financial reasons or because the case settled. Instead, for statements made in advance of litigation, the relevant questions are whether (1) the speaker was seriously and in good faith contemplating a judicial proceeding, and (2) the statements were reasonably related to the contemplated proceeding. In considering whether the statements were reasonably related to the contemplated proceeding, courts should consider the recipient's interests in the statements and/or whether the statements were made to achieve the objects of the litigation.

**{16}** In its opinion in this case, the Court of Appeals cautioned that cases involving the absolute privilege doctrine must be decided on a case-by-case basis. *Helena Chem. Co.*, 2011-NMCA-060, ¶ 16 (citing *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 698 (8th Cir. 1979)). We agree with this approach and proceed to analyze whether in this case the absolute privilege doctrine applies first to the pre-litigation statements and then to the statements that were made after the lawsuit was filed.

**A. THE ABSOLUTE PRIVILEGE APPLIES TO THE PRE-LITIGATION STATEMENTS BECAUSE THE ATTORNEY SERIOUSLY AND IN GOOD FAITH CONTEMPLATED LITIGATION AT THE TIME OF THE STATEMENT, AND THE STATEMENT WAS REASONABLY RELATED TO THE CONTEMPLATED LITIGATION.**

**{17}** Does the absolute privilege apply to the two statements made by Thomas during the public meeting in Mesquite ten months before the lawsuit was filed? The privilege applies *if* at the time the statements were made (1) Thomas was seriously and in good faith contemplating a judicial proceeding, and (2) the statements were reasonably related to the contemplated proceeding. The Court of Appeals answered the first question in the affirmative, stating that

> [r]esidents of the Mesquite community were concerned with what they
> believed to be a historical, existing, and continuing environmental hazard to
> their community caused by Helena, and they sought out Ms. Thomas. She

6

was an attorney who was knowledgeable on the environmental issues and who had engaged Helena and others in environmental litigation in Texas. Residents invited Ms. Thomas to attend the December 2007 meeting to discuss the environmental issues and the possibility of filing a judicial proceeding against Helena. Residents and Ms. Thomas were aware of the history of [New Mexico Environment Department] actions against Helena. The facts support the conclusion that, at the time of the December 2007 meeting, the residents responsible for holding the meeting and Ms. Thomas in good faith contemplated and gave serious consideration to initiating a judicial proceeding, thereby falling within the test in *Gregory Rockhouse Ranch*.

*Helena Chem. Co.*, 2011-NMCA-060, ¶ 18. We agree with the Court of Appeals' conclusion that these statements were made at a time when litigation was seriously and in good faith being contemplated.

**{18}** There are sound policy reasons for applying the privilege to pre-litigation communications made in anticipation of litigation. As the California Supreme Court stated in *Rubin v. Green*, 847 P.2d 1044 (Cal. 1993) (in bank):

It is not difficult to imagine the consequences likely to follow in the wake of a rule permitting the defendant in a civil action to institute parallel litigation seeking to impose liability on the attorney for the adverse party based on the circumstances surrounding the formation of the attorney-client relationship that led to the filing of the original suit. . . . The impairment of colorable claims by disrupting access to counsel, the intimidating effect on attorneys of facing an almost certain retaliatory proceeding, the distractions inherent in requiring counsel to deal with defending a personal countersuit as well as the predicate action and, in general, the dampening effect on the unobstructed presentation of claims which we have identified as the central value supporting limitations on other derivative tort actions, apply with equal force to this suit.

847 P.2d at 1050. The *Rubin* policy considerations are consistent with the broad policy statement articulated by the Court of Appeals when it applied the absolute privilege doctrine in *Romero*, that the privilege is justified so that "attorneys as officers of the court [have] the utmost freedom in their efforts to secure justice for their clients." *Romero,* 85 N.M. at 476, 513 P.2d at 719 (internal quotation marks and citation omitted).

**{19}** However, the more difficult question in this case is whether Thomas's pre-litigation statements were reasonably related to the contemplated judicial proceeding. This question raises difficulties because the statements were made to residents of Mesquite who were contemplating litigation against Helena in the presence of a political blogger. "The question of the relationship between the alleged defamatory matter and the proposed or existing

7

judicial proceeding is a question of law to be determined by the court." *Penny*, 101 N.M. at 520, 684 P.2d at 1185. In analyzing this question, we consider the interest of the political blogger in the statement and how his presence, if at all, might have furthered the objects of the contemplated judicial proceeding.

**{20}** The Court of Appeals concluded that the statements were not reasonably related to the contemplated judicial proceeding because the blogger was not in any way related to nor did he hold an interest in the judicial proceeding. *Helena Chem. Co.*, 2011-NMCA-060, ¶¶ 20, 30. The Court of Appeals recognized that the blogger was invited to educate the public about the judicial proceeding that was being contemplated by residents of Mesquite who were concerned about environmental and health hazards relating to Helena's operations. *Id.* ¶ 20. However, the Court of Appeals did not conclude that the blogger furthered the objects of the contemplated litigation because the blogger could not assist the attorneys in investigating the claims or in presenting the claims in court, two traditional reasons for applying the absolute privilege doctrine. *Id.* ¶ 31. We conclude that the Court of Appeals has interpreted too narrowly the important role the press may play in furthering the objects of mass-tort litigation by educating the public about the need for and availability of legal services. We consider the litigation in this case to be a mass-tort lawsuit because it involves toxic environmental tort allegations involving a number of residents of a particular geographic area. *See Weld v. Glaxo Wellcome Inc.*, 746 N.E.2d 522, 532 (Mass. 2001) ("Mass torts fall into three broad classes: mass accidents, toxic environmental torts and product liability claims."); *Perez v. Wyeth Labs. Inc.*, 713 A.2d 588, 591 (N.J. Super. Ct. Law. Div. 1997) (providing "mass torts frequently involve both temporal and geographic dispersion"), *reversed on other grounds by Perez v. Wyeth Labs. Inc.*, 734 A.2d 1245, 1264 (N.J. 1999).

**{21}** Both the Court of Appeals and Helena cite similar lists of cases from various jurisdictions for the proposition that a "strong majority of cases" agree that publications to the press cannot fall within the sweep of the absolute privilege doctrine.[1] *Helena Chem. Co.*, 2011-NMCA-060, ¶ 24 & 24 n.1. Among the long list of state cases cited, only one involves statements made by plaintiffs or plaintiffs' counsel in a potential class action or mass-tort lawsuit. *See Green Acres Trust v. London*, 688 P.2d 617, 622-23 (Ariz. 1984) (in banc). In *Green Acres Trust*, the Arizona Supreme Court declined to apply the absolute privilege doctrine to extrajudicial statements made by an attorney in a class action lawsuit. *Id.* at 623. The court cited *Asay*, 594 F.2d at 697, for the blanket proposition that the absolute privilege does not extend to press conferences. *Green Acres Trust*, 688 P.2d at 622-23. The court also cited DR 7-107(G), Rule 29(a), Rules of the Supreme Court, 17A A.R.S. (1983), which provides that

> [a] lawyer or law firm associated with a civil action shall not during its

---

[1]We focus on the state cases cited because these provide controlling interpretations of state law regarding absolute privilege.

investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication and that relates to: (1) [e]vidence regarding the occurrence or transaction involved[, or] . . . (4) [h]is [or her] opinion as to the merits of the claims . . . .

*Green Acres Trust*, 688 P.2d at 623. As will be discussed below, the New Mexico Code of Professional Responsibility regarding extrajudicial statements is markedly different than the code relied upon by the *Green Acres Trust* court. In addition, that court did not analyze whether the press can play a valid role in advancing the objects of class action or mass-tort litigation. For these reasons, we do not find the *Green Acres Trust* analysis persuasive.

**{22}** Among the few jurisdictions that have directly considered whether the privilege should apply to statements made to the press in the class action or the mass-tort context, we agree with those that have held that the absolute privilege may apply to statements made to the press. For example, in *Norman v. Borison*, 17 A.3d 697 (Md. 2011), Maryland's highest court applied the absolute privilege to extrajudicial pre-litigation statements that attorneys for a broad group of plaintiffs made to the press. The court determined that application of the privilege would "encourage the free divulgence of information in pursuit of justice," *id.* at 711, because by making the statements to the press, the attorneys could communicate to potential class members that the attorneys intended to file a class action lawsuit, *id.* at 716 & 716 n.23.

**{23}** Similarly, in *Simpson Strong-Tie Co. v. Stewart, Estes & Donnell*, 232 S.W.3d 18 (Tenn. 2007), the Tennessee Supreme Court held that the absolute privilege doctrine would extend to "attorney solicitations published prior to the start of litigation," provided that the attorney had an identified actual or prospective client at the time of the statements, *id.* at 24. The court considered the following factors in deciding whether to apply the privilege to the announcement:

> (1) the communication [is] made by an attorney acting in the capacity of counsel [or prospective counsel], (2) the communication [is] related to the subject matter of the proposed litigation, (3) the proposed proceeding [is] under serious consideration [or already filed] by the attorney acting in good faith, and (4) the attorney [has an actual] client or [an] identifiable prospective client at the time the communication is published.

*Id.*

**{24}** The *Simpson Strong-Tie Co.* court reasoned that because "the privilege exists to protect zealous advocacy," the application of the absolute privilege in the class action or mass-tort context would be consistent with the view expressed in Restatement (Second) of Torts § 586, and will "encourage attorneys to speak freely and candidly, undeterred by the

fear of an action for defamation." *Simpson Strong-Tie Co.*, 232 S.W.3d at 24. The court concluded, and we believe reasonably so, that encouraging candor "is just as compelling when the attorney is advising a prospective client of opportunities to pursue legal redress as it is when the attorney is conferring with an existing client." *Id.*

**{25}** We are also persuaded by the *Simpson Strong-Tie Co.* court's statement that

> [i]n some situations, attorneys may have no practical means of discerning in advance whether the recipients of the communication have an interest in the proposed proceeding. In that event, the attorney can only communicate with those having the ability and desire to join the proposed litigation by publishing the statement to a wider audience, which may include unconnected individuals.

*Id.* at 26. Despite the strong rationale articulated by the *Simpson Strong-Tie Co.* court for applying the privilege in class action or mass-tort litigation, the court noted that it would not apply the privilege to "unnecessary defamatory publications to recipients unconnected with the proposed proceeding," and suggested that where an attorney "has a feasible way of discerning" who would be interested in the case without relying on the press, then use of the press would not be privileged. *Id.* Although we also agree with this statement, in the context of class action or mass-tort litigation, when the attorney has an actual or identifiable prospective client, as a general rule the privilege should apply to communications with the press, because additional prospective clients constitute a large, diverse class of individuals who will be difficult to identify and educate about the need for and availability of legal services. In the context of class action or mass-tort litigation, the most economical and feasible method of informing potential litigants of prospective litigation affecting their interests may be through the press. Thus, use of the press as a conduit to communicate with additional potential class action or mass-tort litigants may be reasonably related to the object of the contemplated judicial proceeding.

**{26}** Helena contends that Thomas did not use the press for the purpose of reaching out to potential unknown plaintiffs, pointing out that neither Haussamen's blog entry after the pre-litigation meeting nor any statements made during the post-filing press conference included Thomas's name or contact information. However, we are not persuaded by this argument because as the defendants in this case argue, "[a] lawyer who speaks to the press in hopes of 'promoting public awareness of [a] proposed [litigation]' has no control over what the press ultimately chooses to write." *Norman*, 17 A.3d at 717. In this case, as pointed out by the Court of Appeals, the blogger was invited "with the desire to inform the public through the news media about the residents' environmental and health concerns and activities related to Helena, if not also to inform the public that a judicial proceeding was contemplated or initiated." *Helena Chem. Co.*, 2011-NMCA-060, ¶¶ 18, 20. The fact that Haussamen did not include Thomas's contact information is immaterial to the analysis.

**{27}** The pre-litigation statements made by Thomas are absolutely privileged because the

statements were made when a mass-tort lawsuit was seriously and in good faith being contemplated, and with the objectives of investigating the merits of potential litigation and identifying for the community those members who may have had a good-faith basis to pursue the litigation. In addition, the statements were made when Thomas both had identifiable prospective clients and while she was acting in her capacity as prospective counsel.

**B.     THE ABSOLUTE PRIVILEGE APPLIES TO STATEMENTS MADE TO THE PRESS AFTER THE COMPLAINT WAS FILED BECAUSE THE STATEMENTS WERE A SUMMARY OF THE COMPLAINT THAT WAS FILED.**

**{28}**     The other two statements challenged by Helena, one made by Thomas and the other by Ms. Uribe, were made after the lawsuit was filed. On the day after the lawsuit was filed, Thomas and her clients held a press conference in Mesquite. During the press conference, Ms. Uribe spoke about the medical issues faced by her children, and allegedly described the medical issues as "upper respiratory problems, pneumonia and bad allergies, [and] bloody noses." Thomas allegedly stated that "[t]he underground water has been contaminated."

**{29}**     As a preliminary matter, we hold that the absolute privilege doctrine applies equally to parties as it does to a party's counsel. *See, e.g.*, *Stryker v. Barbers Super Mkts., Inc.*, 81 N.M. 44, 44-45, 46, 462 P.2d 629, 629-30, 631 (Ct. App. 1969); 50 Am. Jur. 2d *Libel and Slander* § 291 (2012); *see also* Restatement (Second) of Torts § 587. Extension of the privilege is warranted because withholding the absolute privilege from a party's out-of-court statements might "inhibit potential parties or witnesses from coming forward and impede the investigatory ability of litigants or potential litigants, thereby undermining the reasons for the privilege." *Simpson Strong-Tie Co.*, 232 S.W.3d at 26.

**{30}**     A complaint filed in court is absolutely privileged. *See Stryker*, 81 N.M. at 46, 462 P.2d at 631; *see also Superior Constr., Inc. v. Linnerooth*, 103 N.M. 716, 719, 712 P.2d 1378, 1381 (1986) (acknowledging that any publication, including a complaint, filed in court is absolutely privileged). Both Uribe and Thomas argue that republication or reiteration of a filed complaint should also be absolutely privileged. We agree that republishing, repeating, or explaining a complaint that has been filed in good faith should be absolutely privileged because

> [i]n the age of digital communication, it is illogical to protect allegations in a publicly filed complaint but not repetition or explanation of those same allegations outside the courthouse. Allegations of interest to the public or even to a single competitive industry will inevitably reach interested parties, and an explanation limited to the scope of the complaint only narrows the potential harm of statements that would be defamatory but for the privilege.

*PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F. Supp. 2d 673, 684 (S.D.N.Y. 2008)

11

(footnote omitted).

**{31}** In this case, the twenty-three page complaint filed by Thomas on behalf of the Uribes and other litigants from Mesquite stated, in part, that "[t]his is a toxic tort case involving personal injuries and property damage suffered by residents of Mesquite, New Mexico as a result of their exposure to hazardous dust, fumes, and contaminants emanating from the Defendant Helena Chemical Company." The complaint also alleged that Helena had "allowed . . . chemicals to spill, leak or otherwise contaminate the soil and ground" and that Helena allegedly "knew full well of the consequences of its acts and omissions in allowing the toxic and hazardous chemicals . . . to release into the soil, water and air . . . and with conscious indifference to those consequences, made a conscious decision to endanger the lives and property of the Plaintiffs . . . ."

**{32}** The statement by Thomas that "[t]he underground water has been contaminated" repeats the allegations of the complaint. Likewise, the statement by Ms. Uribe regarding the medical condition of her children is an explanation of the damages portion of the complaint as it relates to her children. We conclude that the absolute privilege doctrine should apply to these statements, given the limited nature of the statements. "The harm resulting to a defamed party from delivery of pleadings in a lawsuit to the news media could demonstratively be no greater than if the news media found the pleadings on their own" and "advising the media that a lawsuit has been filed, including a basic description of the allegations, has no practical effect different from providing the pleadings to the media." *Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 239 (Tex. Ct. App. 2000).

**{33}** Helena contends that permitting litigants to speak to the press would open the door to "'trial by press,'" quoting *Kennedy v. Cannon*, 182 A.2d 54, 59 (Md. Ct. App. 1962) (internal quotation marks and citation omitted). Presumably the concern is similar to the concern expressed by the Court of Appeals—that trial by press might have the effect of tainting the jury pool. *See Helena Chem. Co.*, 2011-NMCA-060, ¶ 31. These concerns are legitimate and litigants should be cautious when commenting to the press about ongoing litigation. Indeed we have adopted Rule 16-306 NMRA to address trial publicity. Rule 16-306(A) states that "[a] lawyer shall not make any extrajudicial or out-of-forum statement in a proceeding that may be tried to a jury that the lawyer knows or reasonably should know: (1) is false; or (2) creates a clear and present danger of prejudicing the proceeding." In the commentary to Rule 16-306, we note "certain subjects that are unlikely to have a prejudicial effect on a proceeding," including a statement about "the claim, offense or defense involved." Rule 16-306 Committee Commentary note [3] & [3](1). Our rules also provide for a change of venue in those circumstances where a jury pool has been tainted by pre-trial publicity. *See Lewis v. Samson*, 1999-NMCA-145, ¶ 63, 128 N.M. 269, 992 P.2d 282 ("Change of venue is governed by NMSA 1978, § 38-3-3 (1965), under which a party may move to change venue to a different county for sufficient cause stated in the affidavit of the party, his or her agent, or attorney."), *reversed on other grounds by Lewis ex rel. Lewis v. Samson*, 2001-NMSC-035, ¶¶ 1, 45, 131 N.M. 317, 35 P.3d 972.

**{34}** In this case, the post-filing statements described the claim at issue. Significantly, the statements were made during a press conference scheduled in Mesquite, the community allegedly concerned about the environmental and health hazards occasioned by Helena's alleged tort. However, because the lawsuit was filed in Santa Fe, and that jury pool would not include citizens from Mesquite and its surrounding areas, the risk of tainting the jury pool was minimized, if not eliminated.

**{35}** Moreover, because the post-filing statements were made in the location where additional potential litigants may still reside, these statements also furthered the object of this mass-tort litigation by educating others in the affected community about the need for and availability of legal representation. We conclude that the legitimate, actual usefulness of permitting communication with the press in this situation outweighed the low risk of taint to the parties' jury pool. Therefore, we affirm the district court's grant of summary judgment to Thomas and Uribe.

## III.    CONCLUSION

**{36}** We affirm the district court's grant of summary judgment to Thomas and Uribe because the four statements at issue in this case are absolutely privileged.

**{37}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**STEPHEN PFEFFER, JUDGE**
**Sitting by designation**

**Topic Index for *Helena Chemical Company v. Uribe*, Docket Nos. 32,985/32,987**

**APPEAL AND ERROR**
Standard of Review

13

**ATTORNEYS**
Comments by Attorneys at Trial
Professional Responsibility

**CIVIL PROCEDURE**
Class Actions
Summary Judgment

**EVIDENCE**
Privileges

**TORTS**
Defamation
Immunity
Toxic Tort